

| | |
|---|---|
| NORDSTROM CONSULTING, INC. and INNOVA SYSTEMS, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| | ) No. 06 C 3234 |
| v. | ) ) Judge John W. Darrah |
| M&S TECHNOLOGIES, INC.; J. ANTHONY AND ASSOCIATES, INC.; JOSEPH MARINO and KEVIN BUTLER, | ) ) ) ) ) ) |
| Defendants. | ) ) |
| | ) ) |
| M&S TECHNOLOGIES, INC. and J. ANTHONY AND ASSOCIATES, INC., | ) ) ) ) |
| Counter-Plaintiffs, | ) ) |
| v. | ) ) ) |
| NORDSTROM CONSULTING, INC.; INNOVA SYSTEMS, INC. and STEVEN NORDSTROM, | ) ) ) ) |
| Counter-Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Nordstrom Consulting, Inc. ("NCI") and Innova Systems, Inc. ("Innova"), have

brought suit against Defendants M&S Technologies, Inc. ("M&S"), J. Anthony and Associates,

Inc. ("JAA"), Joseph Marino and Kevin Butler. Plaintiffs allege copyright infringement

(Counts I-III), violation of the Digital Millennium Copyright Act (Count V), breach of contract (Counts VI and VII), fraud (Count VIII), deceptive trade practices (Count IX), consumer fraud and deceptive business practices (Count IX [sic]), common-law unfair competition (Count X), violation of the Lanham Act (Count XI), conversion (Count XII), intentional interference with prospective business relationships (Count XIII) and unjust enrichment (Count XIV). Additionally, Plaintiffs seek a declaration of copyright ownership (Count IV).

Defendants have filed a counterclaim against Plaintiffs, as well as against Steven Nordstrom. Defendants allege violation of the Digital Millennium Copyright Act (Counterclaim Count II), violation of the Computer Fraud and Abuse Act (Counterclaim Counts III-V), violation of the Illinois Computer Tampering Act (Counterclaim Count VI), violation of the Lanham Act (Counterclaim Count VII), deceptive trade practices (Counterclaim Count VIII), common-law unfair competition (Counterclaim Count IX), conversion (Counterclaim Count X), intentional interference with prospective business relationships (Counterclaim Count XI), libel (Counterclaim Count XII), slander (Counterclaim Count XIII), trade secret misappropriation (Counterclaim Count XIV), unjust enrichment (Counterclaim Count XV) and breach of fiduciary responsibility (Counterclaim Count XVI). Defendants M&S and JAA also seek a declaration that they are not infringing on Plaintiffs' copyrights (Counterclaim Count I).

Plaintiffs have moved for summary judgment on Counts I, II, and IV-VII of their Complaint, as well as on Counts I-III, V, VI, X and XII-XVI of Defendants' Counterclaim. Defendants have moved for summary judgment on all counts of Plaintiffs' Complaint and on Counts III-VI and XIV of Defendants' Counterclaim.

2

## BACKGROUND

Defendant M&S is an Illinois corporation engaged in, among other things, the sale and distribution of visual acuity systems to third-party distributors of ophthalmic equipment and end users of such equipment. (Defendants' 56.1(a)(3) at ¶ 1.) Defendant JAA is an Illinois corporation engaged in, among other things, the sale and distribution of visual acuity systems. (Defendants' 56.1(a)(3) at ¶ 2.) Defendant Joseph Marino is President of both M&S and JAA. (Defendants' 56.1(a)(3) at ¶¶ 2, 3.) Defendant Kevin Butler is an employee of M&S (Defendants' 56.1(a)(3) at ¶ 4.)

In approximately 2000, Marino approached Counter-Defendant Steven Nordstrom regarding programming a visual eye chart for a computer. (Defendants' 56.1(a)(3) at ¶ 15.) Nordstrom then developed a source code for use in a visual acuity system. (Defendants' 56.1(a)(3) at ¶ 16.) M&S supplied the computers that Nordstrom used to develop the software. (Defendants' 56.1(a)(3) at ¶ 39.)

Nordstrom is President of NCI and Innova. (Plaintiffs' 56.1(a)(3) at ¶ C.) M&S entered into an oral agreement with Plaintiff/Counter-Defendant NCI, an Illinois corporation. (Defendants' 56.1(a)(3) at ¶¶ 5, 18.) The oral agreement between NCI and M&S set out the terms under which the parties would divide the revenue from the sales of the visual acuity systems. (Defendants' 56.1(a)(3) at ¶ 18.) Under the oral agreement, NCI was to be compensated by taking the sales price of the visual acuity system, subtracting out an estimated amount paid for the equipment ("COGS"), an agreed-upon figure to cover marketing, and an external installation charge; and the remainder was split evenly between NCI and M&S. (Defendants' 56.1(a)(3) at ¶ 18.) For each system sold, M&S generated an invoice, also referred

3

to as a "calculation worksheet," that set out the calculation used to determine the split between M&S and NCI, including the sales price of the system, the COGS, the marketing figure and external installation charges. (Defendants' 56.1(a)(3) at ¶ 19.) Nordstrom's wife, Cheryl Nordstrom, checked all invoices for accuracy and occasionally found errors, which were then corrected by M&S. (Defendants' 56.1(a)(3) at ¶ 21.) Nordstrom had the ability to, and did on occasion, check the COGS in M&S's accounting system against the COGS on the invoices. (Defendants' 56.1(a)(3) at ¶ 24.)

By 2002, Nordstrom had an office at M&S and was there on a daily basis. (Defendants' 56.1(a)(3) at ¶ 34.) Nordstrom was often the only person present at the M&S office to accept support calls and answer technical questions for the production personnel and answer technical questions from customers and distributors. (Defendants' 56.1(a)(3) at ¶ 34.) Additionally, Nordstrom's role at M&S included the training of M&S production personnel, making recommendations to M&S regarding hiring of personnel, authorizing replacement units, making joint decisions with Marino on offering free upgrades and conferring with others at M&S about how to improve the profitability of the company. (Defendants' 56.1(a)(3) at ¶¶ 37, 38.) Nordstrom was a "trusted advisor" to M&S. (Defendants' 56.1(a)(3) at ¶ 40.) He had access to anything that was on M&S's computer network, including all of the financials associated with M&S's business. (Defendants' 56.1(a)(3) at ¶ 41.)

NCI retained source code for software on computers owned by M&S, including a Dell GX 260. (Defendants' 56.1(a)(3) at ¶ 46.) On February 25, 2005, Butler sent three emails to Nordstrom, who was on vacation at the time, advising Nordstrom that he needed to access the source code on the Dell GX 260 due to an error in a customer's system. (Defendants' 56.1(a)(3)

at ¶ 48.) Butler told Nordstrom that he, Butler, could disable the BIOS password protection on the Dell GX 260 but would not do so unless Nordstrom verified that the source code was on the Dell GX 260. (Defendants' 56.1(a)(3) at ¶ 48.) Five days later, on March 2, Nordstrom sent a return email to Butler, informing him that the source code was on the Dell GX 260. (Defendants' 56.1(a)(3) at ¶ 49.) In that email, Nordstrom did not caution Butler not to disable the BIOS password. (Defendants' 56.1(a)(3) at ¶ 49.) Butler replied that he had accessed the code. (Defendants' 56.1(a)(3) at ¶ 50.)

In March or April of 2005, Nordstrom became dissatisfied with M&S. (Defendants' 56.1(a)(3) at ¶ 43.) On August 23, 2005, Nordstrom sent an email to Butler, stating that Nordstrom was pushing for a new corporation -- one in which Nordstrom would own half. (Defendants' 56.1(a)(3) at ¶ 44.) Although Nordstrom asked Butler to keep the email in "strict confidence," Butler disclosed the email to M&S. (Defendants' 56.1(a)(3) at ¶¶ 43, 44.)

On October 20, 2005, Nordstrom filed an application to incorporate a business. (Defendants' 56.1(a)(3) at ¶ 53.) That business was Plaintiff/Counter-Defendant Innova. (Defendants' 56.1(a)(3) at ¶ 53.) Nordstrom also filed copyright applications for software Nordstrom had written for M&S, (the "NCI Software"). (Defendants' 56.1(a)(3) at ¶ 55.) Some of the applications dated back as far as June 2005. (Defendants' 56.1(a)(3) at ¶ 55.) Nordstrom did not inform anyone at M&S that he had filed copyright applications. (Defendants' 56.1(a)(3) at ¶ 55.) Nordstrom filed the copyright application with the knowledge that a patent application had previously been filed for a visual acuity system, naming Nordstrom and Marino as inventors. (Defendants' 56.1(a)(3) at ¶ 55.) Nordstrom is the only person who wrote the source codes for

5

which he obtained copyrights. (Plaintiffs' 56.1(a)(3) at ¶ 1.) Nordstrom assigned those copyrights to NCI. (Plaintiffs' 56.1(a)(3) at ¶ 2.)

On November 9, 2005, Nordstrom formally severed ties with M&S. (Plaintiffs' 56.1(a)(3) at ¶ 5.) When Nordstrom left M&S, he took a number of things from their offices, including the entire contents of the "Acuity" directory from M&S's network hard drive. (Defendants' 56.1(a)(3) at ¶58.) Nordstrom also altered installation disks containing installation software for M&S's visual acuity systems. (Defendants' 56.1(a)(3) at ¶ 60.) The change caused a pop-up message to appear on the visual acuity system after a certain period of time. (Defendants' 56.1(a)(3) at ¶ 60); (Plaintiffs' 56.1(a)(3) at ¶ 7.) The message stated that the software was "unauthorized." (Defendants' 56.1(a)(3) at ¶ 61.) The message also contained Nordstrom's cellular phone number so that the end user could call Nordstrom to have him restore the acuity system. (Defendants' 56.1(a)(3) at ¶¶ 62, 63.) Additionally, at some point before November 9, 2005, Nordstrom securely erased information stored on at least two M&S computers, using a "dots" program or file.[1] (Defendants' 56.1(a)(3) at ¶¶ 65-67.)

Nordstrom hired counsel and caused cease-and-desist letters to be delivered to M&S's attorney and Butler on November 9, 2005. (Defendants' 56.1(a)(3) at ¶ 59.) The letters stated that "Nordstrom terminated its relationship with M&S" and withdrew any authorization for M&S to use and sell its software. (Defendants' 56.1(a)(3) at ¶ 68.) Furthermore, the letter demanded that M&S return or delete all copies of the software. Additionally, the letter also indicated that M&S might negotiate with Innova the right to sell and use the software. (Defendants' 56.1(a)(3)

---

[1]The parties disagree whether this should be referred to as a "dots file" or a "dots program."

at ¶ 68.) Nordstrom hand-delivered a letter to Butler at his residence, threatening legal action if M&S did not comply with the above demands. (Defendants' 56.1(a)(3) at ¶ 69.)

The parties negotiated a written license agreement on or about December 14, 2005 (the "December 14 Agreement"). (Defendants' 56.1(a)(3) at ¶ 70.) The December 14 Agreement enabled M&S to continue selling computer systems with software that Nordstrom had worked on until February 26, 2006. (Defendants' 56.1(a)(3) at ¶ 70.)

Innova is in direct competition with M&S and sells equipment to the same client base. (Defendants' 56.1(a)(3) at ¶ 72.) The client base includes medical professionals, such as general and surgical ophthalmologists and other professionals involved in vision testing. (Defendants' 56.1(a)(3) at ¶ 72.) Innova refers to M&S's SMART SYSTEM in its advertising, has claimed that its systems are now the only systems to use NCI Software, and identifies NCI Software as the software that powered M&S's SMART SYSTEM brand. (Defendants' 56.1(a)(3) at ¶¶ 73, 74.) Innova contacted M&S's distributors to convince them to drop M&S in favor of Innova. (Defendants' 56.1(a)(3) at ¶ 76.) Innova later handed out literature at trade shows, advising third parties of this lawsuit against M&S. (Defendants' 56.1(a)(3) at ¶ 79.) Innova sent copies of the complaint and the memorandum opinion and order denying Defendants' motion to dismiss to at least one third party and claimed that the order meant that "Joseph Marino and his assistant will be held personally liable for their actions regarding this complaint." (Defendants' 56.1(a)(3) at ¶ 79.)

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) when no genuine issue of material fact exists or when, drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (*Anderson*); *Popovits v. Circuit City Stores, Inc.,* 185 F.3d 726, 731 (7th Cir. 1999); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 150 (7th Cir. 1994). Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992).

One of the "principal purposes" of awarding summary judgment is to "isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (*Celotex*). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court that there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex,* 477 U.S. at 322-27; *Anderson,* 477 U.S. at 254-56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 923 (7th Cir. 1994).

## ANALYSIS

*Declaration of Copyright Ownership - Count IV of the Complaint; Count I of Counterclaim*

Plaintiffs seek a declaration that Nordstrom is the sole author of the NCI Software and that NCI is the sole owner of the copyrights for that software. Defendants claim that Marino is a joint author of the NCI Software.

The Seventh Circuit addressed the issue of joint ownership of copyrights in *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061 (7th Cir. 1994) (*Erickson*). Joint ownership of a copyright results only if the parties intended to be joint authors at the time the work was created. *Erickson*, 13 F.3d at 1070. Additionally, "a contributor will not obtain a co-ownership interest, unless the contribution represents original expression that could stand as the subject matter of copyright." *Erickson*, 13 F.3d at 1070 (quoting Paul Goldstein, *Copyright Principles, Laws and Practice* § 4.2.1.2, at 379 (1989)). An author "must supply more than mere direction or ideas." *Erickson*, 13 F.3d at 1071. Rather, an author "is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Erickson*, 13 F.3d at 1071 (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989)).

Defendants point to the contributions of Marino in arguing that Nordstrom was not the sole author of the NCI Software. Marino's contributions included conducting "extensive investigation regarding pediatric visual acuity testing systems," identifying the "features and functions that should be present on such systems," providing "extensive information" to Nordstrom "concerning the setup" of the systems and providing "extensive input regarding the various screen displays to be provided." (Marino Decl. ¶¶ 3-5.)

Defendants have not shown Marino's contributions to be original expressions. Rather, Marino's actions amount only to "direction and ideas" regarding how the software should operate and are thus not sufficient to make Marino a joint author of the NCI Software. It was Nordstrom who translated those ideas into a "fixed, tangible expression" by actually writing the code for the software. That Marino was the one who specified to Nordstrom what the software must do and provided the information necessary to write the code does not make Marino an author.

Defendants' arguments that Marino and Nordstrom intended themselves to be joint authors of the NCI Software are similarly unconvincing. Defendants point out that the parties agreed to split profits from the visual acuity systems and that the patent application for the system names both Nordstrom and Marino as inventors. However, the visual acuity systems are distinct from the NCI Software. That Marino and Nordstrom agreed to split profits from and considered themselves co-inventors of the system as a whole does not mean that they both co-authored the NCI Software, which was only one component of the entire system.

Therefore, Plaintiffs' motions for summary judgment are granted on Count IV of Plaintiffs' Complaint and Count I of Defendants' Counterclaim. Defendants' motion for summary judgment on Count IV of the Complaint is denied. Nordstrom is hereby declared the sole author of the NCI Software, and NCI is the sole owner of the copyrights for the NCI Software.

*Copyright Infringement - Counts I-III of the Complaint*

Counts I - III of the Complaint allege copyright infringement by Defendants. Both sides have moved for summary judgment on these claims.

In Count I, Plaintiffs allege that Defendants violated 17 U.S.C. § 106(1), (3) by selling unauthorized copies of the NCI Software. Specifically, Plaintiffs allege three different actions by the Defendants violated the act. Plaintiffs allege, first, that Defendants shipped older - and therefore unauthorized - versions of the software; second, that Defendants created unauthorized installation disks and; third, that Defendants shipped software after Nordstrom had revoked the agreement between the parties.

Plaintiffs allege that while the agreement between the parties authorized Defendants to sell only the most recent versions of the software, Defendants sold older version, as well. Defendants contest not only Plaintiffs' interpretation of the agreement but also whether Defendants in fact did sell older versions of the software. Additionally, Defendants argue that Nordstrom had the ability to verify that only the most recent versions were being sold. Thus, Defendants have shown that there exist genuine issues of material fact, preventing summary judgment for Plaintiffs on this issue.

Plaintiffs further claim that Defendants created unauthorized installation disks that were used to install the programs associated with the NCI Software. Defendants dispute Plaintiffs' assertion that Defendants did not have authorization to make these disks. Because a genuine issue of material fact exists as to Defendants' authority in this regard, Plaintiffs' summary judgment motion must be denied on this issue.

Plaintiffs further allege that Defendants sold unauthorized copies of the NCI Software between November 9, 2005, when NCI revoked Defendants' authorization to use the software, and December 14, 2005, when the parties entered into a written agreement. Plaintiffs identify

four occasions on which Defendants admittedly shipped copies of the NCI Software and point to four additional unauthorized copies of the NCI Software found in a clinic in South Dakota.

Defendants argue that these sales were authorized retroactively by the December 14 Agreement. Defendants cite *Lone Wolf McQuade Associates v. CBS, Inc.*, 961 F.Supp. 587 (S.D.N.Y. 1997) (*Lone Wolf*), for the proposition that a retroactive license can cure past infringements. The December 14 Agreement provides "Any sale of an Application by M&S made following November 9, 2005 shall be subject to the terms of this agreement." The agreement then specifies when payment is due for those sales. Plaintiffs argue that the December 14 Agreement granted licenses only to the end users and did not grant a retroactive license to Defendants. Plaintiffs point to a provision in the December 14 Agreement wherein neither party waived claims against the other.

Plaintiffs' interpretation of the agreement is contrary to the plain language of the clearly controlling provision of the agreement, which authorized M&S to distribute the NCI Software. That provision not only specified that sales between November 9, 2005, and December 14, 2005 were "subject to the terms of the agreement" but further specified how payment for those sales was to be made. Plaintiffs cannot explicitly authorize Defendants to sell the NCI Software, albeit retroactively, and now claim that those same sales violated Plaintiffs' copyrights. Thus, Plaintiffs' motion for summary judgment is denied; and Defendants' motion for summary judgment is granted as to this issue.

Defendants do not specifically address Count I of the Complaint in their memorandum in support of their motion for summary judgment. In their reply brief, Defendants argue that because Plaintiffs received compensation for all sales of software, Defendants cannot be liable

12

for copyright infringement. However, Defendants not only failed to raise this argument in their original brief but also improperly restrict their arguments to the period between November 9 and December 14, 2005. Plaintiffs' claims in Count I are not limited to this time frame. Thus, Defendants' motion for summary judgment on Count I of the Complaint is denied, other than to the extent set out above.

In Count II of the Complaint, Plaintiffs allege that Defendants violated 17 U.S.C. § 106(2) by creating "Smart System Basic," a program derived from the NCI Software. Both Plaintiffs' and Defendants' motions for summary judgment on this count must be denied due to the existence of genuine issues of material facts. Defendants claim that they had Nordstrom's authority to develop the system and that the software used to install it was unchanged from the software that Nordstrom had helped develop. Due to factual disputes, both Plaintiffs' and Defendants' summary judgment motions are denied on Count II of the Complaint.

In Count III of the Complaint, Plaintiffs allege that Defendants violated 17 U.S.C. § 106(2) by creating, "Sports Vision Testing," a product which Plaintiffs claim is an unauthorized derivative of the NCI Software. Defendants have moved for summary judgment on Count III.

To prevail in a suit for copyright infringement, a plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of that work that are original." *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994) (*Wildlife Express*) (quoting *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). Infringement may be inferred when it is shown that "the defendant had access to the copyrighted work, and the accused work is substantially similar to the copyrighted work." *Wildlife Express*, 18 F.3d at 508 (quoting *Atari Inc. v. North American Philips Consumer Electronics Corp.*, 672

13

F.2d 607, 614 (7th Cir. 1982) (*Atari*)). A plaintiff cannot prevail if "(1) the similarities between the works are not sufficient to prove copying, or (2) it is established that one work was arrived at independently without copying." *Wildlife Express*, 18 F.3d at 508.

Defendants claim that M&S hired independent developers to create a new software program for M&S vision acuity systems shortly after Nordstrom sent an email to Butler stating his intention to renegotiate or terminate his relationship with M&S. Defendants claim to have used a "clean room" procedure to develop the new software. "Clean room" procedure attempts to avoid violations of the copyright laws by using two separate teams of developers to create a competing product. *See DSC Communications Corp. v. DGI Technologies, Inc.*, 898 F.Supp. 1183, 1190 n.3 (N.D. Tex. 1995) (*DSC*). The first team describes the functional aspects of a product to the second team; the second team then uses those descriptions to write the code for a competing product. *DSC*, 898 F.Supp. at 1190 n.3. Defendants claim to have instituted a clean room procedure in which Marino and Butler fulfilled the role of the first team, while the second team was composed of three independent programmers who worked offsite and had no access to the program code. If Defendants did indeed follow clean room procedures, then Plaintiffs would be unable to make the necessary showing that Defendants had access to the copyrighted work. *See DSC*, 898 F.Supp. at 1190 n.3.

Plaintiffs argue that Defendants violated the clean room procedure. Plaintiffs point to two emails from Butler to the independent programmers in which Plaintiffs allege Butler sent the programmers the source code. Defendants respond that the emails contain "'pseudocode' which was used to help the developers understand what the new system needed to be able to do." Further, even if Butler did not send any portions of the actual copyrighted source code to the

14

independent programmers, Butler may have suggested solutions to difficulties encountered by the independent programmers in writing the new code. Also, because Butler had access to the NCI Software, his assistance to the programmers could be a violation of the clean room procedure.

However, Plaintiffs have not shown that the code or pseudocode suggested by Butler is either identical or substantially similar to a portion of the copyrighted code that was an original expression of Nordstrom and subject to copyright. Plaintiffs have not shown either of these factors. Thus, Butler's possible violation of the clean room procedure does not satisfy the access requirement as argued by Plaintiffs.

Even if Plaintiffs could establish that the developers of the new software had access to the NCI Software, they would still need to prove that the new software is substantially similar to the NCI Software. *Wildlife Express*, 18 F.3d at 508. Plaintiffs have offered no evidence towards meeting this burden. Defendants' expert, Dr. Peter Nelson, concluded that the protected elements of the programs are not substantially similar. Though Plaintiffs make a few cursory attacks on Dr. Nelson's report, they offer no argument as to why his conclusions are incorrect. Plaintiffs have offered no expert report of their own to refute Dr. Nelson's conclusions. Plaintiffs have, therefore, failed to offer any evidence in support of Count III. Therefore, Defendants' motion for summary judgment is granted as to Count III of the Complaint.

*Violation of the Digital Millennium Copyright Act - Count V of the Complaint*

Plaintiffs allege that Defendants violated the Digital Millennium Copyright Act, ("DMCA"), 17 U.S.C. § 1201 *et seq.* Both Plaintiffs and Defendants have moved for summary judgment on this count.

15

The relevant portion of the DMCA provides: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). Plaintiffs allege that Butler violated the statute by circumventing the password protection on a computer being used by Nordstrom, in order to gain access to the NCI Software.

In *Chamberlain Group Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178 (Fed. Cir. 2004) (*Chamberlain*) , the Federal Circuit held that to show a violation of § 1201(a)(2) of the DMCA, a plaintiff must show that the access resulting from the circumvention of the technological measure must be in a manner that "infringes or facilitates infringing a right protected by the Copyright Act." *Chamberlain* 381 F.3d at 1203. In *Storage Technology Corporation v. Custom Hardware Engineering & Consulting, Inc.*, 421 F.3d 1307 (Fed. Cir. 2005) (*Storage Technology*), the court clarified that the same requirement applied to § 1201(a)(1) of the DMCA, as well. *Storage Technology*, 381 F.3d at 1318.

Plaintiffs have failed to show that Defendants' circumvention of the password protection to gain access to the NCI Software infringed or facilitated infringing on Plaintiffs' rights under the Copyright Act. It is undisputed that Butler accessed the NCI Software in order to repair or replace the software of a client of M&S and a valid licensee of the NCI Software. Thus, Defendants' motion for summary judgment on Count V of the Complaint is granted.

### Breach of Oral Agreement - Count VI of the Complaint

In Count VI, Plaintiffs allege that Defendants breached the oral agreement governing their relations. Specifically, Plaintiffs assert that Defendants incorrectly calculated and overstated the COGS, which was deducted from the amount of sale, thereby reducing the amount NCI received for each sale. Defendants argue that NCI was provided with invoices setting out the COGS rate

16

and that NCI could have challenged these at any time. NCI's failure to do so, Defendants argue, indicates that the COGS rate was in compliance with the oral agreement.

While the course of dealing between the parties may provide strong evidence as to terms of the oral agreement, it is not conclusive. There is a genuine dispute between the parties as to whether the COGS were calculated correctly, i.e, in accordance with the agreement. Thus, Defendants' motion for summary judgment is denied as to Count VI of the Complaint.

### *Breach of Written Agreement - Count VII of the Complaint*

Plaintiffs allege that Defendants violated the written agreement by failing to fully compensate NCI for sales made during the period covered by the agreement. Both parties have moved for summary judgment on this count.

The dispute between the parties on this issue comes down to whether Defendants paid NCI for a single system sold to a clinic in South Dakota. Defendants claim that it is uncontroverted that the system in question was paid for under the terms of the December 14 Agreement. Plaintiffs claim that the serial number of the system and records of payments between M&S and NCI show that they were never compensated for that sale. Due to this genuine issue of material fact, both Plaintiffs' and Defendants' motions for summary judgment are denied as to Count VII of the Complaint.

### *Fraud - Count VIII of the Complaint*

Plaintiffs allege that NCI relied on false representations by Defendants regarding the COGS and marketing expenses and that NCI was damaged as a result of that reliance. One of the elements of common-law fraud is that the victim must have relied on the defendant's statement. *See Bixby's Food Sys., Inc. v. McKay*, 193 F.Supp.2d 1053, 1085 (N.D. Ill. 2002). Reviewing

the undisputed facts of this case, it is clear that NCI did not rely on Defendants' statements. Plaintiffs had access to M&S's accounting system and could verify the actual cost of goods sold against the COGS rate. Nordstrom did in fact compare the COGS rate in M&S's accounting system against the COGS used in the invoices provided to NCI by M&S. Given Nordstrom's access to M&S's books and his actions to verify the COGS rate, it cannot be said that NCI relied on Defendants' statements regarding the COGS. Therefore, Plaintiffs are unable to establish the fraud on the part of Defendants. Summary judgment in favor of Defendants is granted as to Count VIII of the Complaint.

### Lanham Act and Related Counts - Counts IX-XI of the Complaint

Plaintiffs allege that Defendants have violated the Lanham Act, 15 U.S.C. § 1125 (Count XI), the Uniform Deceptive Trade Practices Act, 815 ILCS 510 (Count IX), the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505 (Count IX [sic]), as well as common-law unfair competition (Count X). Defendants have moved for summary judgment on all of these counts.

Defendants argue that Plaintiffs' Lanham Act claim must fail because they have no evidence to support the claim and no evidence that any representations made by Defendants were likely to confuse any customer. In response, Plaintiffs point to an email sent by Marino to a customer in which Marino claimed that a system he recently demonstrated was the same system that another customer had been using for five years. Plaintiffs allege that this statement is false because the latter system must have used the NCI Software, while the former must have used M&S's new software. Plaintiffs argue that this statement is literally false and that, therefore, they do not need to show actual deception or likelihood of deception. *See Hot Turtle Wax, Inc. v.*

18

*Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). Defendants argue that this email could not have affected the customer's purchasing decisions. However, Plaintiffs have raised a genuine issue of material fact with respect to this claim. Defendants raise additional arguments in their reply. However, those arguments were not made in their original brief and are, therefore, waived for purposes of deciding this motion.

Defendants base their motion for summary judgment on the related claims (Count IX, Count IX [sic] and Count X) on their arguments against Plaintiffs' Lanham Act claim. Because Defendants' motion for summary judgment on the Lanham Act claim is denied, Defendants cannot prevail on their motion for summary judgment on these related counts. Defendants' motion for summary judgment is, therefore, denied with respect to Counts IX-XI of the Complaint.

### *Conversion - Count XII of the Complaint*

Plaintiffs allege that Defendants have committed the tort of conversion by "intentionally retaining unauthorized physical copies of the copyrighted software." Plaintiffs' evidence for this claim is the deposition testimony of Robert Vallejo, a former M&S employee who now works for Innova. Mr. Vallejo's testimony could be construed to show that Defendants retained disks containing the NCI Software into the summer of 2007. Defendants admit that they kept some disks after Nordstrom's departure on November 9, 2005. Thus, Defendants' motion for summary judgment is denied as to Count XII of the Complaint.

### *Intentional Interference with Prospective Business Relations - Count XIII of the Complaint*

Defendants allege that Plaintiffs cannot offer any evidence in support of their claim for intentional interference with prospective business relations and have moved for summary

19

judgment on that count. Defendants again rely on their arguments in support of their motion for summary judgment on Plaintiffs' claim from unfair competition. Because Defendants' motion has been denied as to Plaintiffs' claim for unfair competition (Count X), Defendants' motion for summary judgment with respect to Count XIII of the Complaint is also denied.

### *Unjust Enrichment - Count XIV of the Complaint*

Plaintiffs allege that Defendants were unjustly enriched when they retained the profits of sales of warranties and/or service agreements and failed to compensate Plaintiffs for the same. Plaintiffs argue that Nordstrom was involved in answering calls and providing service to customers. Plaintiffs claim that Nordstrom was, therefore, entitled to a portion of the profits.

A plaintiff asserting a claim for unjust enrichment must show that the defendant voluntarily accepted a benefit which would be inequitable for him to retain without payment. *Ramirez v. Smart Corp.*, 371 Ill.App.3d 797, 808-09 (2007).

Plaintiffs cannot prove that Defendants were unjustly enriched. Plaintiffs knew that service contracts were being sold and that Plaintiffs were not receiving compensation for those sales. Plaintiffs cannot show that they ever requested to receive compensation for the sales; Nordstrom testified that he does not recall ever making such a request. Plaintiffs cannot now claim that Defendants were unjustly enriched by an arrangement of which Plaintiffs had full knowledge and did not object to at the time. Defendants' motion for summary judgment is granted as to Count XIV of the Complaint.

## Violation of the DMCA - Counterclaim Count II

Defendants allege that Nordstrom violated the DMCA, 17 U.S.C. § 1201(a)(3), by circumventing the digital security of M&S's computer network. M&S's network was divided in two – one side dealt with visual acuity systems, and the other dealt with the hotel/hospitality business. Defendants assert that while Nordstrom had a password to access the acuity side of the system, he did not have a password to access the hotel side. Defendants allege that Nordstrom claimed to have accessed the hotel side of the system. Thus, because he did not have access through a password, Defendants argue that Nordstrom must have circumvented a technological measure, in violation of the DMCA. Plaintiffs argue that Nordstrom did not access the hotel side of the system and that any materials on the hotel side of the system were not registered copyrights, a required element of a violation of § 1201(a)(3).

Plaintiffs' motion for summary judgment on this point must be denied because there exists a disputed issue of material fact. Defendants have offered evidence that Nordstrom accessed the hotel side of the system, and have alleged that the hotel side contained copyrighted works. Thus, Plaintiffs' motion for summary judgment is denied as to Count II of Defendants' Counterclaims.

## CFAA Violation - Counterclaim Counts III-V

In Counts III-V of the Counterclaim, Defendants allege violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1310. Counts III, IV, and V of Defendants' Counterclaim allege violations of § 1310(a)(2), § 1310(a)(4) and § 1310(a)(5), respectively. Both sides have moved for summary judgment on all three of these counts.

21

In response to Count III of the Counterclaim, violation of § 1310(a)(2), Plaintiffs point out that because Defendants are neither a financial institution nor a department or agency of the United States, which are covered in subsections (A) and (B), respectively, the only part of § 1310(a)(2) that might apply is subsection (C). An individual violates § 1310(a)(2)(C) when he or she "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer if the conduct involved an interstate or foreign communication." 18 U.S.C. § 1310(a)(2)(C). Plaintiffs argue that Defendants have not offered any evidence to show that Nordstrom obtained any information through conduct that involved an interstate or foreign communication. According to Defendants, Nordstrom's unauthorized access of Defendants' computers took place entirely within Illinois. Defendants have offered nothing to rebut Plaintiffs' argument on this point. Therefore, because Defendants have offered no evidence to show that Nordstrom's conduct involved an interstate or foreign communication, summary judgment in favor of Plaintiffs is granted on Count III of the Counterclaim and Defendants' motion is denied.

With respect to Counts IV and V of the Counterclaim, the dispute between the parties centers on whether the computers at issue were "protected computers" under the statute. A protected computer is a computer "which is used in interstate or foreign commerce or communication . . . ." 18 U.S.C. § 1030(e)(2)(B). Broadly speaking, there are two types of computers at issue – those used by M&S in its day-to-day business and those sold by M&S to its customers. The former were used by M&S in its business of producing and selling visual acuity systems, including sales across state lines. Therefore, these computers were used in interstate commerce and thus qualify as protected computers. However, there is no evidence that the

computers sold by M&S were ever used in interstate or foreign commerce. Although some of these computers were sold across state lines, there is no showing that those computers were *used* in interstate commerce and thus protected at the time of the conduct alleged. Defendants also argue that the message displayed by at least one computer sold by M&S across state lines, providing Nordstrom's "interstate" phone number, place that computer within the protection of § 1310. While, in a sense, Nordstrom's alleged use of the computer to further his independent business certainly qualifies as an interstate use, this action by Nordstrom in creating and installing this message cannot convert a non-protected computer into a protected one. Thus, computers used by M&S in its day-to-day business are found to be protected under 18 U.S.C. § 1310, while those sold by M&S are found to be not protected under that statute.

Plaintiffs argue that because the computers sold by M&S are not protected computers, damages to those computers cannot be considered in meeting the CFAA's minimum damage requirement of $5,000. *See* 18 U.S.C. §§ 1310(a)(4), 1310(g). However, because Plaintiffs failed to raise this argument prior to their reply brief, it will not be considered at this time. Because neither side has met its summary judgment burden, all motions by the parties for summary judgment on Counts IV and V of the Counterclaim are denied.

*Illinois Computer Tampering Act - Counterclaim Count VI*

Defendants allege that Plaintiffs violated the Illinois Computer Tampering Act ("ICTA"), 720 ILCS 5/16D-3 *et seq*. Defendants argue that Nordstrom erased files on M&S's computers and altered installation software such that it disabled computers sold by M&S. The ICTA provides, in pertinent part, that a person violates the statute when he:

(4) Inserts or attempts to insert a "program" into a computer or computer program knowing or having reason to believe that such "program" contains information or commands that will or may damage or destroy that computer . . . or that will or may alter, delete or remove a computer program or data from that computer . . . or that will or may cause loss to the users of that computer or the users of a computer which accesses or is accessed by such "program."

720 ILCS 5/16D-3(a)(4).

Defendants argue that Nordstrom violated this statute in two ways – first, by copying "dots" onto the hard drive of at least one M&S computer, thereby erasing programs and data on that computer; and second, by altering the installation software in such a way that it disabled computers that M&S sold.

With respect to the issue of copying the dots onto Defendants' computers, the dispute between the parties has centered on whether Nordstrom used a program to copy the dots. As Plaintiffs point out it their reply, this is not precisely the relevant question; the subsection of the statute cited by Defendants requires the insertion of a program onto a computer. Defendants argue that Nordstrom must have used a program to copy the over-twenty-billion dots onto M&S's computers, since it could not have been done manually. If this were found to be true, then it would be necessary to determine whether Nordstrom inserted that program onto M&S's computers or whether the program was previously installed.

A genuine issue of material fact remains with respect to whether Nordstrom inserted a program onto M&S's computer. Therefore, both motions for summary judgment are denied with respect to Count VI of the Counterclaim.

## Conversion - Counterclaim Count X

Defendants allege that Nordstrom intentionally removed foot pedals from M&S's premises, constituting conversion. Plaintiffs counter that Defendants have not offered any evidence showing this. Defendants' proof on this point consists of circumstantial evidence. Defendants developed a process to adapt circuit boards from computer mice to work in foot pedals for their visual acuity systems. During the time Nordstrom was working at M&S's facility, one or two circuit boards that were to be used in production of the pedals disappeared from the production counter. Defendants believe that these circuit boards or foot pedals were taken by Nordstrom. Furthermore, Defendants suspect that Innova uses a foot pedal design that makes use of Defendants' proprietary circuit board modifications. Defendants have not yet had the opportunity to examine the foot pedal used by Innova. It would be inappropriate to grant summary judgment for Plaintiffs on this count at this time. Therefore, Plaintiffs' motion for summary judgment on Count X of the Counterclaim is denied.

## Libel and Slander - Counterclaim Counts XII and XIII

Defendants allege that certain written and oral statements made by Nordstrom constitute libel and slander. Specifically, Defendants charge that the pop-up message Nordstrom caused to appear on the systems sold by M&S, which stated "UNAUTHORIZED DUPLICATION OF SOFTWARE DETECTED," and the statements made orally by Nordstrom to the buyers of the systems who viewed that message were false and represented that M&S sold unauthorized software. Plaintiffs counter that these statements were true at the time they were made, pointing out that all the systems programmed to display this message were shipped before use of the NCI Software was licenced by the December 14 Agreement. However, after that date, the statements

25

would no longer be true. Additionally, Defendants have identified other written and oral statements by Nordstrom about Defendants that may be defamatory. Due to these genuine issues of material fact, Plaintiffs' motion for summary judgment is denied with respect to Counts XII and XIII of the Counterclaim.

*Trade Secret Misappropriation - Counterclaim Count XIV*

Defendants allege that Nordstrom violated the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq.*, by misappropriating trade secrets belonging to M&S. Both Plaintiffs and Defendants have moved for summary judgment on this counterclaim.

"Misappropriation" under the ITSA includes using improper means to acquire a trade secret. 765 ILCS 1065/2. "Improper means" are defined to include "theft, bribery misrepresentation, breach or inducement of a breach or a confidential relationship or other duty to maintain secrecy or limit use, or espionage by other means." 765 ILCS 1065/2.

The parties agree that before Nordstrom notified M&S of his intention to end his relationship with M&S, Nordstrom removed a number of materials from M&S's offices, including the entire contents of the "Acuity" directory on M&S's network hard drive. This directory contained, among other things, M&S's strategic marketing plans, new-product development and rollout schedules, information regarding customer contact information, distribution agreements and in-depth financials. The dispute between the parties centers on whether the items removed by Nordstrom were trade secrets.

The ITSA defines a trade secret as:

> Information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device or method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). The disagreement between the parties comes down to whether the second requirement of this section is met – whether the removed information was subject to reasonable efforts to maintain its secrecy or confidentiality.

The parties agree that M&S used password protection on M&S's computer network to protect the security of this information. M&S allowed access to this network to only a limited number of persons. Plaintiffs argue that the use of password protection alone does not rise to the level of reasonable efforts to maintain secrecy or confidentiality. Plaintiffs point out possible measures that M&S chose not to employ, such as employee confidentiality statements, advising employees that information was confidential, or labeling information as confidential. Plaintiffs cite cases in which courts have found these steps to constitute reasonable efforts. *See Liebert v. Mazur*, 357 Ill. App.3d 265 (Ill. App. Ct. 2005); *Stampede Tool*, 272 Ill. App.3d 580 (Ill. App. Ct. 1995); *RKI, Inc. v. Grimes*, 177 F.Supp.2d 859 (N.D. Ill. 2001). However, those cases do not preclude a finding that other measures might also constitute reasonable efforts. Measures that are insufficient under some circumstances may be reasonable under others. *See Elmer Miller, Inc. v. Landis*, 253 Ill. App.3d 129, 134 (Ill. App. Ct. 1993) (what constitutes reasonable steps may vary, depending on the size of the company).

In this case, the factual background needed to determine the reasonableness of M&S's security measures is lacking. For instance, Plaintiffs have suggested alternate methods that Defendants might have used to grant Nordstrom more limited access, such as providing

27

Nordstrom with hard copies of the documents he needed in his day-to-day work. The feasability of such options cannot be determined at this time. Therefore, Defendants' motion for summary judgment of Count XIV of the Counterclaim, violation of the ITSA, is denied.

### Unjust Enrichment - Counterclaim Count XV

Defendants have alleged that Plaintiffs were unjustly enriched by claiming sole ownership of the NIC Software and by misappropriation of M&S's trade secrets. Plaintiffs have moved for summary judgment.

Defendants cannot claim unjust enrichment based on rights to the NCI Software because, as determined above, Innova is the owner holder of those rights. Furthermore, to the extent that Defendants' claims are based on misappropriation of trade secrets, they are preempted by the ITSA. *See Pope v. Alberto-Culver Co.*, 296 Ill. App.3d 512, 519 (Ill. App. Ct. 1998) (Illinois Trade Secrets Act preempts unjust enrichment claims based on trade secret misappropriation); *Web Communications Group, Inc. v. Gateway 2000, Inc.*, 889 F.Supp. 316, 321 (N.D. Ill. 1995) (same). Therefore, summary judgment is entered in favor of Plaintiffs on Count XV of the Counterclaim .

### Breach of Fiduciary Responsibility - Counterclaim Count XVI

Defendants have alleged that Nordstrom breached a fiduciary duty he owed to Defendants. Plaintiffs have moved for summary judgment on this counterclaim.

Under Illinois law, a party advancing a claim for breach of fiduciary duty must prove the existence of a fiduciary duty, breach of that duty and damages proximately resulting from that breach. *Neade v. Portes*, 193 Ill.2d 433, 444 (Ill. 2000). A fiduciary duty arises either as a matter of law or by special circumstances. *Critchon v. Golden Rule Ins. Co.*, 358 Ill. App.3d

1137, 1149 (Ill. App. Ct. 2005) (*Critchon*). Defendants have not shown facts that support special circumstances. *See Critchon*, 358 Ill. App.3d at 1149 (special circumstances involve the party owing the duty gaining a superiority and influence over the other). Fiduciary duties exist as a matter of law as a result of certain relationships, including partnerships and joint ventures. *Autotech Tech L.P. v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006) (*Autotech*). Defendants assert that a joint venture existed between the parties, leading to a fiduciary duty on the part of Nordstrom.

To establish a joint venture, a party must prove: (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill or knowledge; (4) a degree of joint proprietorship or mutual right to the exercise of control over the enterprise; and (5) a provision for joint sharing of profits and losses. *Autotech*, 471 F.3d at 748. Plaintiffs allege that Defendants cannot prove that a joint venture existed because they cannot show that Nordstrom and M&S shared losses.

The agreement between Nordstrom and M&S provided that they would receive equal shares of all revenue from sales of visual acuity systems after subtracting the COGS and marketing expenses. Under this arrangement, there is no situation in which Nordstrom would incur a loss on the sales. Defendants have provided no evidence that Nordstrom would be required to cover any losses in the event that M&S's costs exceeded its revenues.

Defendants cite one example in which they claim Nordstrom and M&S shared a loss. The situation involved the sale of Book PCs, which had to be recalled. Defendants claim that both Nordstrom and M&S shared the loss. However, this one narrow instance is not alone

sufficient to establish that the parties agreed to share losses over the course of their five-year relationship. The method by which Nordstrom was compensated, agreed on by both parties – one half of the revenue after deducting the COGS and marketing expenses – did not involve the sharing of losses. Therefore, the parties were not engaged in a joint venture.

Defendants have offered no alternative theory and no evidence that a fiduciary duty existed between Nordstrom and M&S. Therefore, summary judgment is entered on behalf on Plaintiffs on Count XVI of the Counterclaim.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted with respect to Count IV of the Complaint and Counts I, III, XV and XVI of Defendants' Counterclaim. Defendants' motion for summary judgment is granted with respect to Counts III, V, VIII, and XIV of the Complaint and with respect to Count I of the Complaint to the extent set out above. The motions for summary judgment are denied as to all other counts.

Dated: March 4, 2008

JOHN W. DARRAH
United States District Court Judge